THE STATE OF FLORIDA EX REL. ATTORNEY-GENERAL, PLAINTIFF IN ERROR, VS. DENNIS BURNS, DEFENDANT IN ERROR.

1. A leading purpose of section 16, Article III, of the Constitution is to prevent the incorporation into one act of legislation of more than one subject and matter properly connected therewith. A further object of the requirement is to avoid surprise or fraud in legislation by means of provisions in bills, of which the titles give no sufficient notice, and to this end a title of an act should fairly apprise not only the members of the Legislature, but the people to be affected, of the subject of legislation being enacted.

2. When the title of an act clearly expresses the whole object of the Legislature, and the provisions in the body of the act are germane to the subject expressed in the title, an essential requirement of the Constitution has been met, but a general subject may become restricted in details in the body of the act by the title, and where one is so framed as to indicate that matters connected with the subject, generally considered, are not to be treated of in the bill, it is misleading as to any legislation on such matters.

3. Titles to bills must not be misleading, or tend to avert inquiry as to provisions in acts.

4. Section 16, Article III, of the Constitution is mandatory, and the correct rule is to enforce its restrictions in all cases coming within the mischiefs intended by it to be arrested, while in cases not falling within such mischiefs a liberal construction should obtain in favor of the law-making power.

5. The title of the act of 1895 (Chapter 4513), as it passed the Legislature, is "An act to provide for the creation of the city of Pensacola, now known as the provisional municipality of Pensacola, and for the government of said city of Pensacola, and to provide for the support and maintenance of said government and improvement of said city." Under the general provisions in the last part of the act provision is made for the appointment by the mayor and confirmation by the council of harbor master, who shall perform all the duties now performed by harbor masters, as set forth in section 956 of the Revised Statutes. The harbor master of the port of Pensacola had never been legally associated with the municipal governments of Pensacola, but has, from the creation of the office in 1866, been appointed by the Governor, and the defendant in error is the Governor's appointee to said office: *Held*, That the said provision in the act in reference to the appointment of harbor master by the mayor of the city of Pensacola was not constitutionally enacted.

(TAYLOR, J., dissenting).

Writ of Error to the Circuit Court for Escambia county.

STATEMENT.

The relator on June 24th, 1895, filed in the Circuit Court of Escambia county an information in which he alleged the passage of the act of the Legislature of the State of Florida, entitled "An act to provide for the creation of the city of Pensacola, now known as the provisional municipality of Pensacola, and for the government of said city of Pensacola, and to provide for its officers and their terms of office, and to provide

for the support and maintenance of said government and improvement of said city," and its approval by the Governor on May 27th, 1895; that such act designated certain named persons as Commissioners of Election to conduct an election for Mayor and Aldermen and other officers of said city, and to declare the result of the election; that under said act an election was held on June 4th, 1895, and at it were elected as Mayor and Aldermen certain persons named in the information, who were duly thereafter declared elected by the said Commissioners, and that such persons were duly qualified and eligible, and on June 7th, 1895, took the oath of office and were respectively inducted into the offices of Mayor and Aldermen; that said act provided for the appointment by the Mayor and confirmation by the said Board of Aldermen of a Harbor Master with the powers, duties and emoluments mentioned in the act; that such Board of Aldermen duly and lawfully elected the relator as such Harbor Master; that he was qualified and eligible therefor, and before the filing of the information took the oath of office prescribed by law and the ordinances of said city, and gave the bond prescribed by said ordinances and became qualified to hold the said office; that before the said election and qualification of relator, the respondent, Dennis Burns, was the incumbent of said office under appointment by the Governor and confirmation by the Senate of the State of Florida, and that the relator has made demand upon the respondent to surrender the said office, its property, insignia, franchises, *etc.*, but that the respondent has refused, and still enjoys and uses such property, insignia,

24

franchises, *etc.* The prayer is the usual one in *quo warranto* proceedings.

Respondent, by attorneys, filed a demurrer to the information upon the grounds: "1st. That said alleged act of the Legislature of the State of Florida, entitled "An act to provide for the creation of the city of Pensacola, now known as the provisional municipality of Pensacola, and to provide for its officers and their terms of office, and to provide for the support and maintenance of said government and improvement of said city," is unconstitutional and void because the title of the same was materially altered and changed after it had passed both houses of the Legislature and been signed by the officers thereof, and before its signature by the Governor, by the insertion therein of the said words "and to provide for its officers and their terms of office," and immediately after the word "Pensacola" as last occurring in said title. 2d. The said alleged act is in violation of section 27, Article III, of the Constitution of the State of Florida. 3d. The said alleged act is in violation of section 16, Article III, of the Constitution of the State of Florida, in that it embraces more than one subject and matter properly connected therewith, *i. e.*, the creation of a city and its government, and the amendment of the laws relating to the State office of Harbor Master. 4th. The section of said alleged act relating to the said office of Harbor Master is in violation of section 16, Article III, of the Constitution of the State of Florida: *a.* Because it seeks to amend the laws of the State relating to the State office of Harbor Master, without expressing same in the title of the act. *b.* Because it seeks to give to the said Harbor Master appointed by the Mayor of the city of Pensacola juris-

diction and authority outside of the territorial limits of the city without expressing such subject in the title of the act. After argument the Circuit Court sustained the demurrer and (the relator not desiring to amend) dismissed the information.

The relator has sued out a writ of error to this court, and assigns as error: 1. That the court erred in sustaining the demurrer of the respondent, Dennis Burns, to the information in this cause. 2. That the court erred in rendering judgment against the informant and dismissing the said cause.

*Jno. Eagan, C. B. Parkhill,* and *Blount & Blount,* for Plaintiff in Error.

We consider only the first assignment of error, for if the demurrer to the information was properly sustained, the judgment consequent upon such sustaining was proper.

1. We do not discuss this ground of the demurrer for it is covered adversely to the defendant by the case of the State ex rel. versus L. Hilton Green, 36 Fla.

2. This ground is as follows: "The said alleged act is in violation of section 27, Article 3, Constitution of the State of Florida." That section is as follows:

"Section 27. The Legislature shall provide for the selection by the people or appointment by the Governor of all State and county officers not otherwise provided for by this Constitution and fix by law their duties and compensation."

What is meant by the demurrer, is, that section 15 of the act of May 27, 1895, (pamphlet acts page 362) is inoperative as far as it seeks to cause the office of Har-

bor Master of the city of Pensacola to be filled by appointment of the Mayor and Council, because such office is a State office and its incumbent must, under the Constitution, be appointed by the Governor or elected by the people.

In determining the test as to whether an office is a State office, and whether it can be made a city office, it is well to eliminate some of the things which are not tests.

1. It is obvious that the source from which the commission emanates or from which the power and authority is derived, is not the test, because all officers, State, county and municipal, derive their authority from the sovereign, the State of Florida, and are therefore officers of the State. 13 Fla. 693, 694.

2. It is obvious that the source of appointment is not a test, because under the constitutional provision in question the Governor may appoint or the people elect county officers as well as State officers, and because in the absence of constitutional limitations as to the depositary of the power of appointment, it lies with the Legislature to determine where such power shall be placed. Fox vs. McDonnell 101 Ala. 51.

3. It is obvious if there be nothing in the nature of an office or in the constitutional mention or description of it making it a State office, an attempt by the Legislature to make it so, even though such attempt be successful, could not prevent a succeeding Legislature from making the same office a county office, or a city office. Without limitation by the Constitution or by the nature of the office, the legislative power would be absolute.

Applying these doctrines to this case, the question to be solved does net seem difficult.

If the Legislature before 1895 had made the office of Harbor Master a State office, the mere fact of having done so does not prevent the same power from changing its will and making it a city office.

There is no mention in the Constitution of the office of harbor master and therefore there is no constitutional denomination of the office as a State office which stands in the way of the Legislature's making it a city office.

Then, unless there be something inherent in the nature of the office itself making it a State office, the act under consideration making it a city office is valid.

From what we have said it results that there can be no test as to whether an office is or not a State office, but the duties of that office. If the duties be to the State as a State, or to all the citizens of the State, or duties in which all the citizens have an interest other than sentimental, then the office is a State office, otherwise it is not. Of course in this test territorial limits play an important part, but only as defining the boundaries within which the beneficiaries of the duties reside, and not as imposing a limitation upon the place of performance of such duties. In other words, the duties need not be performed in or over the whole of the State territory, but they must be in the interest of all the inhabitants of that territory.

The illustration as to the officers of the State penitentiary (13 Fla. 695) who are localized, but whose duties appertain to the people of the whole State, is apt here.

The harbor master does not fall within the limits of this definition. His functions are confined to a locality embracing but a small part of the State. They are not in behalf of the State, nor of all the citizens of the

State.   The improper or proper exercise of them does
not in the least concern, for instance, a citizen of Jack-
son or Osceola counties.   Both his function and his
territory are strictly local.   He does not exercise a
State function in any sense, the reason for his appoint-
ment being the protection of the interests of those in-
terested in vessels which may bring their trade to the
city of Pensacola, and he simply exercises a police ju-
risdiction.   Though this jurisdiction may be larger
than a city, it is less than a State and in no wise con-
nected with State affairs or the interest of the public
or of the State.

The authorities cited below by the defendant, hold-
ing that certain officers appointed by municipalities,
were State officers, are not in point here.   They sim-
ply announce the well settled doctrine that a city has
some functions relating to its corporate capacity and
some functions relating to a governmental capacity, and
that an officer representing its govermental capacity
can not by his negligence or mismanagement make it
responsible in damages, while an officer representing
its corporate capacity can do so.   For instance:   It is
held that a police officer or police judge or fire com-
missioners or members of the fire department are State
officers in the sense that they exercise governmental
functions, and that, therefore, a suit for damages
against the city for their negligence will not lie.   This
is, however, different from establishing their status as
State officers in the sense used in our Constitution.   If
they were such in that sense, then the Governor would
have to appoint or the people elect every policeman in
the city, every fireman, every sanitary inspector, be-
cause all of these represent the duties of the State to-
wards the citizens, and in that sense they are State

JUNE TERM, 1896.          375

State ex rel. Attorney-General v. Burns.—Argument of Counsel.

officers. These authorities are, moreover, against the defendant, because while the courts held that they were State officers, yet they were appointed by a municipality and are recognized as subordinates to the municipality and were simply held to exercise governmental functions for the purpose of relieving the city from liability. Applying these authorities to this case, they would simply go to show that if the harbor master was appointed by the city and exercised governmental functions, the city could not be held responsible for his misfeasance or malfeasance.

There can be no question that the functions of the harbor master being local and protective of the interests of the city, the Legislature would have the power to make him a city officer and have him appointed by the city council if it saw fit, if the duties were all performed within the limits of the city.

The defendant, however, says that this may be true, but that part of his functions are exercised outside of the limits of the city of Pensacola, and that, therefore, he can not be a city officer, nor owe his appointment to the city.

There are several answers to this:

A. That the assumed fact does not appear:

B. That if it does appear, it furnishes no reason why such extra territorial jurisdiction should not be exercised by the city appointee:

C. That if he could not exercise extra territorial powers, he could exercise within the city the powers bestowed upon him, and the act would be sustained to that extent:

a. The defendant says that the court will take judicial notice that the city of Pensacola does not include the whole harbor of Pensacola, and since the jurisdic-

tion of the harbor master extends over the whole harbor, part of that jurisdiction must be without the limits of the city.

As we understand the law, the courts will take judicial notice of the existence of cities, but not of their territorial limits or of whether a particular place is within such limits. We do not care, however, to waste time on this contention, for the fact is that a large part of the harbor of Pensacola is outside of the city of Pensacola. If the court, however, takes judicial notice of the fact, it will also take notice that much of the harbor is within the limits and that this portion includes all the territory devoted to trade and commerce, the business houses and merchants, all the wharves at which vessels, located by the harbor master, lie, nine-tenths of the anchorage of vessels while lying within the harbor of Pensacola and more than nine-tenths of the territory over which the duties of the harbor master are exercised. See R. S. Fla. sec. 956.

b. If, however, the court knows judicially that the territorial limits of the city are not co-extensive with the territory over which the possible duties of the harbor master may be exercised, still it does not follow that the act is invalid. It is obvious that the place where the duties are performed is immaterial.

They can be done entirely extra territorially. The Minister at the Court of St. James, all of whose duties are done in England, is none the less an officer of the United States.

The Legislature of Florida could make an officer to superintend the selection of United States lands, all of whose duties should be done at Washington. Under the quarantine laws of 1869, Chap. 1714, secs. 2 and 4, city quarantine boards might have officers in

quarantine stations, or lazarettoes outside of the city boundaries. As some northern cities have, there might be municipal fiscal agents or officers permanently residing and operating outside of such limits, etc., etc.

And, intra territorially, the localization of the work done by the officer, would not present any test as to whether he was or was not a State officer. The judges of this court are localized at Tallahassee, as are the cabinet officers, and yet clearly they are State officers.

It is well settled that corporations may hold lands extra territorially. 2 Dil. on Municipal Corp. sec. 565; 1 Dil. on Municipal Corp. sec. 103; and they may also exercise police jurisdiction extra territorially when the Legislature so declares, as was done in this case. State vs. Franklin, 40 Kan. 410; State vs. Franklin, 19 Pac. Rep. 801; Coldwater vs. Tucker, 36 Mich. 474; Van Hock vs. Selma, 70 Ala. 361, 15 A. & E. Encyc. 1006 and 1007.

Nor is it any objection to considering him a municipal officer that some of the functions to be performed by him might be for or of benefit to adjoining counties or to the State.

Tax assessors, sheriffs, county commissioners, etc., perform important duties for the State, but are nevertheless county officers. 13 Fla. 695, 696.

There would be no harbor master if there was no city. He is appointed to subserve the purposes of its trade and commerce. He is master of the harbor, but solely because the functions which he performs are necessary for the city. It having the sole interest, should have the power of appointment, it being entirely within the power of the Legislature, in the absence of constitutional limitation, to determine in what

functionary the power of appointment shall rest. Fox vs. McDonnell, 101 Ala. 51.

The Legislature has exercised its power in this matter and no other authority in the State can dispute the propriety of that exercise.

c. As we have before said, if the court can take judicial notice of the limits of the city of Pensacola, it will know that those limits include the locations of wharves, the business and the vessels, as hereinbefore set forth and even though it should find that there had been no proper legislation conferring the duties of the State harbor master upon the municipal harbor master as to the territory outside of the limits of the city, yet it must find that the great bulk of his duties could be done inside of the limits and that the Legislature intended that those duties should be devolved upon the municipal officer. We have then duties protecting citizens of Pensacola and its commerce to be performed within its territorial limits and there can be no reason in holding that such duties can not be performed by a municipal officer.

If this be the correct view, then the court would overrule the demurrer, because it reaches to a denial of the right of the officer to exercise any functions now exercised by the defendant, and it will declare that as to the functions exercised by the defendant within the territorial limits of the city of Pensacola, he is usurping the right of the relator.

It is a usual and common thing for a court to declare an act inoperative as to something outside the power of the Legislature and sustain that which is inside of the power of the Legislature, and in this case it is too clear for argument that it is entirely within the power of the Legislature to declare that the func-

JUNE TERM, 1896. 379

State ex rel. Attorney-General v. Burns.—Argument of Counsel.

tions of the harbor master within the limits of the city of Pensacola may be performed by an officer of the city of Pensacola.

3. It is unnecessary to discuss this ground of the defendant's demurrer, because it is based upon the idea that the subject matter of the act is double because it embraces legislation relating to city affairs proper and also legislation relating to State officers.

It is clear that if the harbor master is not a State officer but can be made a city officer, then the whole subject matter of the act relates to municipal affairs and the act is not double. On the other hand, if the harbor master is a State officer and can not be made a municipal officer, then the act as to him is void upon the second ground of the demurrer and it is useless to discuss its effect in any other point of view.

4. This ground of the demurrer, is, that that portion of the act providing for harbor master is in violation of section 16, Art. 3, Constitution of the State of Florida.

a. Because it seeks to amend the laws of Florida relating to the State officer of harbor master without expressing the same in the title of the act.

b. Because it seeks to give to the city harbor master appointed by the Mayor of the city of Pensacola, jurisdiction and authority outside of the territorial limits of the city without expressing such title in the act.

Both of these grounds of demurrer relates to the form of accomplishing that which the Legislature intended to accomplish.

The substance has already been discussed.

A. This has been practically disposed of, because if the harbor master could be made a municipal officer, then he clearly falls within the scope of the title to create the city of Pensacola and to provide for its government, etc.

B. This ground, we think, is equally untenable. As we have already shown, it is entirely within the power of the Legislature to confer upon cities extra territorial jurisdiction either by extending the territory so that the city shall cover it, or by extending the police jurisdiction without any extension of the territory. In this case there is not any attempt on the part of the city to extend its territory, but simply an attempt of the Legislature to extend the police jurisdiction. The authorities above cited show that this can be done. The only question here is whether it can be done under the title. That, too, seems without doubt.

The title to create the city of Pensacola was sufficient to deal not only with the powers of the city, but also with its limits, and under such title it would be competent to make the diameter of the city 10 miles or 30 miles or more or less. None of the incidents need be expressed in the title. The title says it creates the city of Pensacola. All the matters properly connected with that creation, among which would clearly be the definition and jurisdictions of the city and its officers, would properly come, and it is not required to state such definition in the title. This view is fully sustained by the case of the State ex rel versus Duval Commissioners, 23 Fla. 504. In that case the Legislature under the title "An Act to establish the Municipality of Jacksonville," abolished the charters of Springfield, Lavilla and Fairfield and embraced their territory within the limits of Jacksonville. The

same point was made there as here and the court de-
cided that the title was broad enough to cover the in-
corporation of this territory into the city and the re-
peal of the charters of the other cities. This decis-
ion covers not only the point that the embracing of
other territory in the city limits can be made under
this general title, but also the point raised by counsel
that the office of State harbor master could not be
abolished without a statement of the intent to make
such abolition in the title, since this case decides that
the repeal of an act inconsistent with the act then
being enacted need not be expressed in the title.

Upon this point see also Lake vs. Palmer, 18 Fla.
510, 512.

In this case it appeared that one act repealed an-
other. The second made new and different officers,
without mentioning the repeal of the first or without
mentioning the officers provided for in the first, and
the court said that the destruction of the offices and
the repeal of the former act was merely an incidental
effect of the second act and did not violate the Con-
stitution.

See also directly upon this point, Fox vs. McDon-
nell, 101 Ala. 51.

The defendant, however, says that though the title
of the act to create the city of Pensacola might have
been broad enough to permit extra territorial exten-
sion, yet that limitation is made in the title itself by
the words "Now known as the Provisional Municipal-
ity of Pensacola," and that that confines the limits to
those of the present municipality.

They cite as bearing upon this the case of State vs.
Blair, 17 S. E. Rep. decided by the Supreme Court of
Georgia. In that case the title of the act was "An

Act to make a new charter for the city of Columbus."
That necessarily implied that the city should remain
the same, but that the powers conferred in the char-
ter should change. There is no such limitation in this
act. The word to "create" show that there is to be
entirely new and original legislation, without reference
to any former legislation, or to any formerly existing
state of affairs. There. is no restriction of the territo-
rial limits to the limits of the former provisional mu-
nicipality. Besides, following the words "Provisional
municipality," occur the words "to provide for the gov-
ernment of the same and to provide for the mainten-
ance and support," etc. These words show clearly
that the laws, rules and status of the provisional mu-
nicipality was not to govern, but that the Legislature
was engaging in an aborigine proceeding with refer-
ence to the city of Pensacola.

The Ga. case, moreover, simply declares that the
Legislature had not the power under such title to ex-
tend the territorial limits. It does not declare that
the territorial limits being the same, it would not have
the power under such a title to give extra territorial
jurisdiction to some of the officers of the municipality.
It seems clear that the court could not have so decided,
because there is embraced in the new charter the idea
of new powers, new functions and new jurisdiction.
The conferring of these things is what was done in
this case and is entirely covered by the provision in
the title to provide for the government of the same.

But, as we said in another branch of this case, if
the title of the act was not broad enough to cover the
granting of jurisdiction to the harbor master outside
of the territorial limits, it is broad enough to cover
such jurisdiction inside the territorial limits, and the

court will simply eliminate from his powers those which the title is not extensive enough to cover and will allow him to retain those covered by the title. All the functions of the harbor master within the limits of the city of Pensacola may be performed by an officer of the city of Pensacola, and it is too clear for argument that as to such officer a title to create the city of Pensacola and to provide for its government is amply broad.

*Mallory & Maxwell,* for Defendant in Error.

MABRY, C. J.:

The title of the act, Chapter 4513, laws of 1895, as we must consider it, is "An act to provide for the creation of the city of Pensacola, now known as the provisional municipality of Pensacola, and for the government of said city of Pensacola, and to provide for the support and maintenance of said government and improvement of said city." In the title of the enrolled bill signed by the Governor, and as published in the acts of the Legislature, the additional words "and to provide for its officers and their terms of office" are found, but we have held in the case of State *ex rel.* vs. Green, 36 Fla. 154, 18 South. Rep. 334, that, as shown by the journals of the Legislature, the additional words were not in the title when the act passed the two houses of the legislative branch of the government, and could not be considered as a part of the title of the act. The body of the act contains 155 sections with general provisions, and by the first section the inhabitants of the *city of Pensacola* are created corporate by the name and style of the city of Pensacola. The second section divides the powers of government

into legislative, executive and judicial; the legislative consisting of a Board of Aldermen, the executive of a Mayor with executive boards, and the judicial of a police court. Certain officers and servants of the corporation are provided for, such as comptroller, treasurer, tax collector, assessor, city attorney, and physician, judge of the police court, clerk, and marshal. Provisions in the act clearly show that the newly created city was constructed upon the foundation of an existing municipality. The first section, already referred to, provides that the inhabitants of the *city of Pensacola* are hereby created corporate, and section 124 enacts that the boundaries of the city shall, until changed as provided by statute, remain as now established by ordinance. There is nothing in the 155 sections of the act, excluding the general provisions, extending the powers of government beyond the scope and already defined limits of, the municipal grants to the existing provisional municipality. The title of the act pointedly directs attention to the existing municipality, its terms, in part, being "an act to provide for the creation of the city of Pensacola, now known as the provisional municipality of Pensacola." In 1885 the Legislature passed an act, with certain amendments, for the dissolution of municipal corporations under circumstances therein stated, and to provide provisional governments for the same, and under this act the city of Pensacola became a provisional municipality. There was passed in 1893 an act to fix the number and provide for the election of certain municipal officers of the provisional municipality of Pensacola, and to prescribe their terms of office, and regulate their compensation and duties. By this act certain designated officers for the provisional municipality

were elective, and provision was made for their election. Such was the legal status of the municipal government of Pensacola when the act of 1895, *supra*, was passed. Among the general provisions of this act, and the latter part of a paragraph in reference to the oath of office of the city officers and their eligibility to office, the following is found, *viz:* "The wharves shall be under control of the council consistent with existing law and vested rights, and there shall be elected by the board first elected under this act, at the first meeting in the month of June, one thousand eight hundred and ninety-five, or as soon thereafter as is possible, and every four years thereafter, one harbor commissioner. Such commissioner shall perform such duties as the preservation of deep water in the harbor may require, and shall in all matters protect the city's interest, and require the proper discharge of ballast, ashes, refuse, sinking of timber, binders or other lumber or timber or other refuse in the harbor, either in or outside of the city limits, as may be provided by ordinance, and shall from date of his election perform all duties now performed by, and shall be invested with all the authority now conferred on the public custodian of lost timber and lumber, receiving for his services such fees as are now allowed by law to said custodian, whose duties from the passage of this act, and his election, shall be performed by said harbor commissioner. At the same time and for the same term of office (four years) as provided above for the harbor commissioner, a harbor master shall be appointed by the mayor and confirmed by the council, who shall perform all the duties now performed by harbor master as set forth in section 956 of the published edition

of the Revised Statutes, and from the date of his appointment shall possess all powers and have charge of all duties, and be subject to all restrictions, and secure as compensation such fees as are now provided by law for harbor master." Section 956 of the Revised Statutes relate to the duties of harbor masters appointed by the Governor for the different harbors of the State. There is a clause in the act repealing all acts or parts of acts in conflict with it. The question involved in the present case is confined to the office of harbor master, the right to which is asserted by virtue of the provision quoted. The harbor master for the port of Pensacola has not, prior to the act in question, owed his appointment or election to the municipality of Pensacola, either under its original charter, or as a provisional municipality. He has not only not been legally associated with the municipal governments of Pensacola, but has been disassociated therefrom. Provision was made in 1866 for the office of harbor master for the port of Pensacola, and for his appointment by the Governor, and from that time down to the act of 1895 the office has been filled by the Governor, by and with the consent of the Senate. The defendant in error is the Governor's appointee to the office, and he was in office when the act was passed, and continues to hold the same. In our opinion the provision in the municipal act of 1895 relating to the appointment of harbor master has not been constitutionally enacted, and the attempt to pass it offends the 16th section of Article III of the Constitution. This section provides that "each law enacted in the Legislature shall embrace but one subject and matter properly connected therewith, which subject shall be briefly expressed in the title; and no law shall be amended or revised by reference to

its title only; but in such case the act, as revised, or section, as amended, shall be re-enacted and published at length." Under this provision the title of an act becomes essentially important as it has the effect to control the provisions of an act and restrict them to matters properly connected with the subject expressed in the title. We have held in the case referred to (State ex rel. vs. Green) that the title to the act in question, after eliminating the added words, was sufficient to authorize the provisions in the body of the act in reference to the election of municipal officers for the city. The right to the office of alderman under the new charter was involved in that case, and no doubt existed as to the creation of such an office being strictly municipal in character. One of the leading purposes of section 16, Article III, of the Constitution is to prevent the incorporation into one act of more than one subject and matter properly connected therewith, and thereby to arrest the abuse of what has been called "log-rolling" legislation. The subject of the act must be expressed in the title, but matters of detail, or matters properly connected with the subject need not be there stated. When the title clearly expresses the whole object of the Legislature, and the provisions in the body of the act are germane to, or are properly connected with, the subject expressed in the title, an essential requirement of the constitutional provision has been met. If serious doubt exists as to whether matter found in the bill is properly connected with the subject expressed in the title, the courts decide in favor of the legislative power, and sustain the bill. County Commissioners of Duval County vs. City of Jacksonville, 36 Fla. 196, 18 South. Rep. 339. A general subject may, however, become restricted in details in the

body of the act by the title. It is said in State *ex rel.* vs. Palmes, 23 Fla. 620, 3 South. Rep. 171, that "when the title is general the Legislature must be considered as put upon notice as to anything in the bill germane to the subject expressed. The Legislature may, however, make titles as restrictive as it pleases, and where one is so framed as to indicate that certain matters naturally connected with or germane to the subject, generally considered, are not to be treated of in the bill, it is misleading as to any legislation on such matters." It is well established that titles to bills must not be misleading or tend to avert inquiry as to the provisions in acts. The cases cited in Webster vs. Powell, 36 Fla. 703, 18 South. Rep. 441, bearing on the invalidity of acts having false or misleading titles, need not be further discussed, but they will be found to fully sustain the doctrine stated. A further object of the constitutional requirement is to avoid surprise or fraud in legislation by means of provisions in bills, of which the titles give no sufficient notice, and to this end a title should fairly apprise not only the members of the Legislature, but the people to be affected, of the subject of legislation being enacted. State *ex rel.* vs. Green, and Webster vs. Powell, *supra;* State *ex rel.* vs. Hocker, 36 Fla. 358, 18 South. Rep. 767. The provision of the Constitution referred to is mandatory, and the correct rule is to enforce its restrictions in all cases coming within the mischiefs intended by it to be arrested, while in cases not falling within such mischiefs a liberal construction should obtain in favor of the law-making power. The office of harbor master is not provided for by the Constitution, but exists entirely by virtue of legislative enactment. Judge Cooley says (People vs. Hurlbut, 24 Mich. 44, text 103, S.

C. 9 Am. Rep. 103): "For those classes of officers whose duties are general—such as the judges, the officers of militia, the superintendents of police, of quarantine, and of ports, by whatever name called—provision has, to a greater or less extent, been made by State appointment. But these are more properly State than local officers; they perform duties for the State in localities, as collectors of internal revenue do for the general government; and a local authority for their appointment does not make them local officers when the nature of their duties is essentially general." It may be conceded that it is competent for the Legislature by proper legislation to make the harbor master of the port of Pensacola appointive by the mayor of the city of Pensacola, with the consent of the council, but such authority can not be classed among the usual municipal powers. It would be a special grant of power to the municipality. Harbors and docks connected therewith may be regulated by Congress, but in the absence of such regulation the State can exercise control over the same. We do not deem it necessary to decide whether, under a title to an act to create an original municipality and provide for its government, support and improvement, a provision for the appointment of a harbor master, would be matter properly connected with the subject expressed in the title. Conceding that such a provision would be germane to such a subject expressed in the title, it is not decisive of the present case in favor of the plaintiff in error, for the reason that the act in question has not the title stated. The title is to create the city of Pensacola, *now known as the provisional municipality of Pensacola*, and, as pointed out, the latter was an existing municipality with usual municipal powers, but

having no control whatever over the appointment of the harbor master for the port of Pensacola. The terms used in the title, "now known as the provisional municipality of Pensacola," are calculated to mislead as to, and avert attention from, the provision in the act in relation to the appointment of harbor master—a matter entirely beyond the scope of the powers of the existing provisional municipality. It can not be said. in our judgment, that parties in interest, and especially the incumbent of the office of harbor master, were fairly apprised by the title given to the act that matters of such special character, in no way connected with the former municipality, would be gone into. The title with the clause in it is calculated to avert attention from any proposition to subject the harbor master of the port of Pensacola to municipal control, in that it directed attention to the creation of a city, then known as the provisional municipality of Pensacola, which in no way controlled the appointment of the harbor master.

The title to the act involved in the case of Brooks vs. Hydorn, 76 Mich. 273, 42 N. W. Rep. 1122, was "an act to provide for the election of two justices of the peace, and for the appointment of a justice clerk and room for holding justice court, in and for the city of Grand Rapids, and to define their jurisdiction, and to fix their compensation, and to repeal an act entitled 'an act to provide for the election of four justices of the peace in and for the city of Grand Rapids, and to define their jurisdiction, and fix their compensation,' approved March 11, 1881, and all acts and parts of acts in anywise contravening the provisions of this act." At the time the act was passed there were four justices of the peace in office in the city of Grand Rapids,

## JUNE TERM, 1896. 391

State ex rel. Attorney General v. Burns.—Opinion of Court.

and the act legislated two of them out of of office. The opinion says: "No one, in reading the title of this act, while it was a bill before the Legislature, would have been apprised that the offices of respondent and Justice Hughes were not only to be abolished, but that they were to be deprived of holding the same after the fourth day of July, 1889. If one can gather from the clause in the title in relation to the repeal of the act of 1881, which provided for four justices, that the intention and purport of the bill might be to decrease the number of justices from four to two, yet there is not the slightest hint therein that any of the justices already in office should be deprived of their terms, or, if so, which one, or two, of them was thus to be legislated out of office. The notice in the title, which the Constitution imperatively requires, was therefore not given, and the plain purpose of the constitutional mandate evaded and violated." The title of the act considered in the case of State *ex rel.* vs. Commissioners of Duval County, 23 Fla. 483, 3 South. Rep. 193, was "an act to establish the municipality of Jacksonville, provide for its government and prescribe its jurisdiction and powers," and in fixing the boundaries, territory occupied by two existing municipalities, and part of that occupied by a third, was included, and the charters of the municipalities whose territory had been absorbed were repealed. It was held that the repeal of the charters was matter properly connected with the subject expressed in the title. The decision was correct, but the principle decided by it does not conflict, in our opinion, with the conclusion in the case before us. The title of the act mentioned is ample to authorize the establishment of a municipality with all usual municipal jurisdiction and powers, and it has no

restrictive or misleading features about it. In this respect it materially differs from the title to the act of 1895 creating the city of Pensacola.

Our judgment is that the demurrer was properly sustained on the ground that the provision in the act in reference to the appointment of harbor master violates section 16, Article III, of the Constitution, and the judgment of the court will, therefore, be affirmed.

TAYLOR, J., dissenting:

I regret my inability to concur with the other members of the court in the conclusion reached in this case; particularly so, when it involves the constitutionality of an act of the legislative branch of the State government, and feel that it is my duty to give expression to my views on the subject, and in so doing I will discuss the entire case as presented here.

The first ground of the demurrer has been fully discussed and settled adversely to the demurrant, in the case of State *ex rel.* Attorney-General. vs. Green, 36 Fla. 154, 18 South. Rep. 334; in which case the fact was found that the words "and to provide for its officers and their terms of office," were unauthorizedly interpolated into the title of the act, as shown by the journal entries of the two houses of the Legislature, but it was held that said interpolated words were immaterial and superfluous, neither adding to or detracting from the expressiveness by said title of the subject dealt with by the act, particularly so with reference to the election of officers for said municipal government. The gist of this decision was, that after excluding the unauthorizedly interpolated words from the title to this act, what remained thereof was suffi-

cient to authorize all such provisions in the body of
the act as were necessary to give to the municipal gov-
ernment created thereby such officers, designated by
such official titles, as the Legislature might deem to be
necessary to execute the varied municipal powers del-
egated by the act, with appropriate provisions defining
the particular powers and duties of each of them, re-
spectively, and the particular manner in which each
of them was to be chosen, with proper limitations of
their respective terms of office.

The second ground of the demurrer, upon which the
greatest stress was laid in the argument, is that, the
said act of the Legislature is void because it violates
the following, section 27 of Article III of the Consti-
tution: "The Legislature shall provide for the elec-
tion by the people or appointment by the Governor of
all State and county officers not otherwise provided
for by this Constitution, and fix by law their duties
and compensation." The feature of the act that is
claimed by the defendant in error to be in violation of
the foregoing provision of the Constitution is the fol-
lowing provision of section 155, *viz*: "The wharves
shall be under control of the council consistent with
existing law and vested rights, and there shall be
elected by the board first elected under this act at the
first meeting in the month of June, one thousand eight
hundred and ninety-five, or as soon thereafter as is
possible, and every four years thereafter, one harbor
commissioner. Said commissioner shall perform such
duties as the preservation of deep water in the harbor
may require, and shall in all matters protect the city's
interest, and require the proper discharge of ballast,
ashes, refuse, sinking of timber, binders or other lum-
ber or timber or other refuse in the harbor, either in

or outside of the city limits, as may be provided by ordinance, and shall from date of his election perform all duties now performed by, and shall be vested with all the authority now conferred on the public custodian of lost timber and lumber, receiving for his serv· ices such fees as are now allowed by law to said custodian, whose duties from the passage of this act, and his election, shall be performed by said harbor commissioner. At the same time and for the same term of office (four years) as provided above for the harbor commissioner, a harbor master shall be appointed by the mayor and confirmed by the council, who shall perform all the duties now performed by harbor master, as set forth in section 956 of the published edition of the Revised Statutes, and from the date of his appointment shall possess all powers and have charge of all duties and be subject to all restrictions, and secure as compensation such fees as are now provided by law for harbor masters." The contention here was that a harbor master is a *State officer*, and that, under the quoted provision of the Constitution, he can be chosen to the office only through election by the people or appointment by the Governor, and that the quoted section of this act violates the Constitution in lodging his appointment for the port of Pensacola in the hands of the mayor and council of that city. The inquiry arises, is he necessarily a State officer? No such officer is mentioned in or provided for by the Constitution, but we find his creation entirely in legislative enactment; and, from the same source, we find the territorial range of his jurisdiction and his powers and duties also prescribed. In the advisory opinion of this court of June 6th, 1870, to the Governor, 13 Fla. 687, it is said that "State officers, in a general sense, are

JUNE TERM, 1896.	395

State ex rel. Attorney-General v. Burns.—Dissenting Opinion.

officers whose duties and powers are co-extensive with
the territorial limits of the State. County officers, in
the same sense, are those whose general authority and
jurisdiction are confined within the limits of the county
in which they are appointed, who are appointed in and
for a particular county, and whose duties concern more
especially the people of that county." In the concur-
ring opinion of Mr. Justice Westcott, at page 693 of
the same citation, it is said: "It is clear that the
source from which the commission emanates can not be
the test, for under the Constitution all grants and com-
missions must be in the name and under the authority
of the State of Florida." Whether an officer, unpro-
vided for by the Constitution, but created solely by
legislative enactment, is to be regarded as a State or
county officer, within the meaning of the quoted clause
of the Constitution, requiring their appointment by
the Governor or election by the people, must depend
in large measure upon the territorial scope of his ju-
risdiction, and upon the nature and character of his
powers and duties. If the jurisdiction for the exer-
cise of his powers and duties is co-extensive with the
limits of the State, then he is a State officer. If con-
fined, like a sheriff or county judge, within the limits
of a county, but co-extensive with the limits of such
county, then he is a county officer. An apt illustra-
tion of a State officer created entirely by legislative en-
actment was the State Inspector of Oils, provided for
by Chapter 4160, acts of 1893, and abrogated by Chap-
ter 4422, acts of 1895. The powers and duties con-
ferred upon him gave him jurisdiction throughout the
entire limits of the State, and he was, essentially, a
State officer. Had one of such officers been provided
for each county, with the same powers and duties ex-

ercisable over the entire county, but confined within its limits, he would have been essentially a county officer, and it would, in both instances, have been necessary to have filled the position through appointment by the Governor or election by the people, in compliance with this constitutional mandate.

What are the powers and duties of the harbor master for the port of Pensacola, and to what territorial limit does his authority extend? We find him first provided for by Chapter 1620, entitled "an act to establish the office of harbor master for the port of Pensacola, Florida," approved December 8th, 1866. By that act, under the rules and regulations of a Board of Port Wardens, he was given authority to regulate and station all vessels in the bay fronting the city, and at the wharves thereof, and to remove, from time to time, such vessels as were not employed in receiving and discharging cargoes, to make room for such others as required accommodations for receiving or discharging cargoes, and to require masters of vessels and others in charge thereof to accommodate each other in their respective situations. It was further made his duty by this act to superintend and enforce all laws of the State and of the city of Pensacola for preventing and removing all nuisances upon the wharves and water front of the city, and to demand of the captain of every vessel arriving in that port from the sea, the permit of the resident physician, or bill of health, and to report to the mayor of the city all vessels entering the port without such permit. This act also provided for the harbor master's remuneration by fees paid by vessels loading or unloading in the port or mooring at the wharves thereof. By that act he was appointed by the Governor and confirmed by the Senate, and his term

JUNE TERM, 1896.                397

State ex rel. Attorney-General v. Burns —Dissenting Opinion.

of office was for five years, subject to removal by the Governor for misconduct.

The next legislation on the subject was Chapter 3159, approved February 26th, 1879, which did nothing more than prescribe fixed fees to be exacted by the harbor master of the port of Pensacola from vessels.

The next legislation on the subject was Chapter 3306, approved March 8th, 1881, which provided *generally* for the appointment by the Governor with the consent of the Senate of all harbor masters required for the several ports of this State, who should hold their office for a term of two years. By this act no powers or duties were prescribed for the officers to be appointed thereunder, but they were thereby put under the supervision of the pilot commissioners of the port, and subjected to such rules and regulations as such commissioners should prescribe, charging such fees as such pilot commissioners should prescribe. By section 5 of this act the office of harbor master for the port of Pensacola was expressly *excepted* from its provisions, and all previous legislation in reference to the office of that port declared to be unaffected thereby.

The next legislation on the *general* subject of harbor masters is Chapter 3602, approved February 16th, 1885, entitled: "An act to amend section 3 of Chapter 3306 laws of Florida, approved March 8th, A. D. 1881, being an act entitled 'an act to have harbor masters of this State appointed by the Governor.'" This act, as its title indicates, amends section three of the former act of 1881 by prescribing the powers and duties of harbor masters generally, and the duties and powers thus prescribed are exactly the same as those theretofore specially prescribed for the port of Pensacola by the original act of 1866; and it also prescribes their

fees. There is a repealing clause to this act of all laws that conflict, or are inconsistent with its provisions. I do not think that it effects in any way the previous special legislation for the port of Pensacola, except that it may, possibly, enlarge the character of vessels from whom he could exact fees.

The next legislation on the subject is Chapter 3752, passed in 1887, entitled "an act to provide for the appointment of harbor masters for certain ports of the State of Florida, and to provide for and define their duties and powers." This act provides that the Governor with the consent of the Senate shall appoint one harbor master for each port in the State of Florida into which have come, during the past five years, vessels of five hundred tons burden and upwards, at the average rate of two hundred and fifty vessels per year according to the records of the United States Custom House at or nearest the port for which such appointments shall be made. It provides for their giving bond in the sum of two thousand dollars with security payable to the Governor. It makes them *ex officio* a member of the Board of Port Wardens and Commissioners of Pilotage of the port for which he is appointed, and requires that they shall act in obedience to the rules of such boards in all matters within their jurisdiction. By it they are authorized to appoint deputies, they paying such deputies for their services. They are required by the act to board all vessels entering the port, after the vessel has been released by the health authorities of the port, to demand of the master the certificate of the vessels, release by such health authorities, and to deliver the same within twenty-four hours to the Secretary of the Board of Health. It is made their duty at all times to be pres-

ent in person or by deputy to facilitate the loading or unloading of vessels by assigning them berths at the wharves and by requiring each to accommodate others needing more immediate accommodation, and it is thereby made the duty of the master of every vessel entering the port to apply to the harbor master, or one of his deputies for a station in the stream, or a berth at the wharves, and it is made the duty of the harbor master forthwith to station such vessel in the stream or at the wharves, as the case may be, so as best to facilitate the loading or discharge thereof, and at the same time interfere as little as possible with other vessels; and in assigning berths at wharves he is to conform to the wishes of the managers of such wharves. By this act they are authorized to exact fees of all vessels in accordance with the amount and value of the services they render not to exceed $20. Should any vessel require a change of station, it is made the harbor master's duty, on the application of the wharf manager, to make such change. There is a general repealing clause of all laws and parts of laws in conflict with the provisions of this act.

The next legislative action on the subject was the adoption of the Revised Statutes in 1891. In the last named compilation of the laws, the provisions of the act of March 8th, 1881, Chapter 3806, have been retained, requiring the Governor to appoint, with the Senate's consent for a term of two years all harbor masters that may be required for the several ports of the State, and requiring from them a bond in five hundred dollars. The provisions of Chapter 3602, acts of February 16th, 1885, prescribing their powers, duties and compensation, have also been brought forward in and retained as part of the Revised Statutes. The

provisions of Chapter 3752, act of 1887, have also been
brought forward in and retained as a part of the Re-
vised Statutes, requiring the Governor, with the Sen-
ate's consent, to appoint a harbor master for each port
in the State into which have come during the past five
years vessels of five hundred tons and upwards to the
number of not less than two hundred and fifty vessels
per year; and the harbor masters for all such ports are
required to give bond in the sum of two thousand
dollars, and are made *ex officio* members of the Board
of Port Wardens and Port Commissioners for their re-
spective ports. Their powers and duties are the same
as those prescribed by the act of 1887, Chapter 3752,
and their fees are limited not to exceed for each vessel
the sum of twenty dollars according to the amount and
value of the services rendered. For this latter class of
harbor masters there is no expressly fixed term of
office. From these enumerated duties and powers of
harbor masters, and the strictly confined local limits
within which they can, respectively, exercise them, I
think it is clear that they are neither such State or
county officers as the Constitution requires to be elected
by the people or appointed by the Governor. Simply
because the Legislature, in providing for their creation
generally, saw proper to have them appointed by the
Governor, does not make them either State or county
officers in the sense contemplated by the Constitution.
This is aptly illustrated by Chapter 3606, laws of
Florida, approved January 28th, 1885, that repealed
the charters of all incorporated cities and towns in the
State that were indebted to the amount of $200,000,
and that had defaulted in the payment of their inter-
est account, and that provided that for all such mu-
nicipalities the Governor should appoint a Board of

Commissioners, who in turn elected one of their number as President, and such board and its president were clothed with all the powers of a city council and mayor for such cities; which act was sustained in *ex parte* Wells 21 Fla. 280. Simply because it provided for the appointment by the Governor of such city officials did not make them any less strictly municipal officers. Applying the test of their powers and duties, and the confined local limits of the jurisdiction in which they are to be exercised, and keeping the fact in mind that they are purely a creation of the Legislature, I think that harbor masters are not such State or county officers as are required by the Constitution to be appointed by the Governor or elected by the people; but, on the contrary, that their duties and powers are so strictly police and local in character, and so intimately and directly connected with and important to the preservation of the peace and good order of our maritime cities and towns, to whose immediate surroundings their jurisdiction is so locally confined, that the Legislature, in providing for their creation, can, with entire propriety, make them a part of the official machinery of such maritime towns, and lodge with such towns the power to choose them in such manner as the Legislature may prescribe. Their powers and duties are so localized and so closely concern the police regulation of such towns, that it seems to be the usual practice in other States to make them, or officers having similar powers and duties, a part of the official force of such city governments. Vanderbilt vs. Adams, 7 Cow. 349; Tiedeman's Limitations of Police Power, sec. 204.

It was contended here that the questioned act makes

no change whatever in the law relating to the office of harbor master and his duties. The act expressly puts the wharves around the city under the control of its council consistently with vested rights therein. This seems to be entirely proper, and one of the customary powers conferred upon maritime cities. 1 Dillon's Munc. Corp. (3d ed.), secs. 102, 103 *et seq.* and citations. The chief duty of a harbor master is to preserve order among vessels entering such ports at and about its wharves, by assigning them berths thereat. The wharves being put under the city's control, it is eminently proper that the police officer clothed with authority to preserve order about the same should be a part of the city's police force, and under its supervision.

It was also contended that the harbor master exercises jurisdiction outside of and beyond the corporate limits of the city of Pensacola, and that, therefore, he can not legitimately be made a city officer. I fail to see in any of the enumerated duties and powers conferred by the several statutes mentioned upon harbor masters that they are to be exercised outside of or beyond the territorial limits of the city, and nothing of the kind being disclosed by the pleadings, no decision is called for as to the authority of the Legislature to clothe a municipal officer with power to exercise extra territorial jurisdiction, nor as to what effect the power to exercise such jurisdiction might have in changing the character of such officer from municipal to State or county, though there is abundant authority sustaining the power of the Legislature to grant to municipalities the right to exercise police jurisdiction extra-territorially. State *ex rel.* Humphrey vs. Franklin, 40 Kansas, 410, 19 Pac. Rep. 801; Van Hook vs. City of Sel-

ma, 70 Ala. 361; City of Coldwater vs. Tucker, 36 Mich. 474; Chicago Packing & Provision Co. vs. City of Chicago, 88 Ill. 221.

The next ground of the demurrer is that the act is violative of the following, section 16 of Article III, of the Constitution: "Each law enacted in the Legislature shall embrace but one subject and matter properly connected therewith, which subject shall be briefly expressed in the title; and no law shall be amended or revised, by reference to its title only, but in such case the act as revised, or section as amended, shall be reenacted and published at length." The contention presented by counsel here is that the act deals with more than one subject, in that it creates the city and its government and amends the laws of the State relating to the office of harbor master and public custodian of lost timber and lumber.

If it be conceded, and I think that it must be, that a harbor master was not necessarily a State officer, but, on the contrary, from the powers and duties conferred upon him by law, partook more closely the character of a local police official, and could with propriety be made a part of the official force of maritime municipalities, it follows that this legislation so dealing with him is entirely germane to the one general subject of this law—the creation of the municipality of Pensacola—and does not make the law obnoxious to the provision of the Constitution last invoked. The repeal or amendment by this law of former laws providing for the appointment by the Governor of a harbor master for this port is effected by implication, and there is nothing in our Constitution that prohibits the amendment or repeal of a statute or part of a statute by implication, when such amending or

repealing statute is otherwise properly enacted.
State *ex rel.* vs. Hocker, Judge, 36 Fla. 358, 18
South. Rep. 767. Neither is there anything in our
Constitution that requires the title of an act to give di-
rect expression to the fact that some of its provisions
will operate, by implication, as a repeal or amendment
of some prior existing law, provided such provisions
are within or germane to the subject that is expressed
in such title. In the case of State *ex rel.* vs. Commis-
sioners of Duval County, 23 Fla, 483, 3 South. Rep.
193, the title of the act under consideration was "an
act to establish the municipality of Jacksonville, pro-
vide for its government and prescribe its jurisdiction
and powers." Under this title the act provided for
the incorporation into such city of the territory that
up to that time comprised two separate, independent
and distinct municipalities and part of a third, and it
contained a provision expressly abolishing or repeal-
ing the charters of said municipalities whose territory
had been absorbed. It was contended in that case that
the title of the act was insufficient because it did not
express the matter of the repeal of these independent
municipal charters. The act was sustained, however,
upon the ground that its title was fully expressive of
the subject that it dealt with, and that the constitu-
tional requirement did not call for any expression in
the title of an act of matters properly connected with
the subject, and that the incorporation of the territory
of these independent municipalities into the newly
created city was appropriately a part of the general
subject of the act, and that the repeal of the charters
formerly occupying such territory followed necessarily,
and was matter properly connected with such subject
which need not be expressed in the title. That case,

I think, is entirely decisive of the principles involved in the one in hand. In that case the provisions of the act dealt only with matters that were included directly within or were properly connected with the subject expressed in its title, and in so doing interfered with the subjects of former existing, but independent, legislation, and would, by implication, have repealed such former legislation without any express repeal thereof; yet it contained an express repeal that was upheld because it was matter properly connected with the subject being dealt with by the act. In this case, as we have held, the creation of such officials for the city's government as the Legislature might see proper to assign to it as part of its official force, was appropriate to the general subject of the act—the creation of the city government. State *ex rel.* vs. Green, *supra.* Because the creation of such harbor master was already provided for by a former existing law does not render him any the less an appropriate subject to be dealt with by this act. Lake vs. State, *ex rel.* Palmer, 18 Fla. 501; Fox vs. McDonald, 101 Ala. 51, 13 South. Rep. 416. The view taken by the majority of the court is that the words in the title of this act, "*now* known as the provisional municipality of Pensacola," are *respective*, and, consequently, that *nothing new* and unfamiliar to the old provisional order of things could be properly dealt with by the act, and that because the provision of the act assailed does go outside and create a new municipal official who was theretofore unknown to the old provisional government, that its title is misleading, and such a provision, therefore, void. I can not accept this view. If followed to its logical result, then any matter, consisting of either men or measures, contained in this act that is

·different from, inconsistent with, or a stranger to, the old legislation prescribed for the old provisional municipality, must likewise go down. My view is that the quoted words in the title of this act were not intended to be *restrictive*, and are not so, but were put into the title simply to *identify* the *locality* or place to be created into a municipal government, and cut no other figure in the title than the locatively distinguishing words, "in Escambia county, State of Florida," would have done in their place. In the case of State *ex rel.* vs. Commissioners of Duval County, 23 Fla. 483, *supra*, there were two full fledged municipalities, with their complete quota of city officials wiped out of existence, that had been created and provided for by long standing, separate, distinct and independent legislation from that which had up to that time dealt with the city of Jacksonville, yet the act demolishing them, as independent entities, was sustained, though its title gave notice of nothing more than that the city of Jacksonville was to be dealt with. That case, as I think, should be fully decissive of this.

The only notice that the officials and inhabitants of the two demolished municipalities had in that case from the *title* of the Jacksonville act that their independent municipal autonomy was to be interferred with—nay, wiped out of existence—was that their territory lay in the neighborhood of Jacksonville, and *could* be (not *would* be) appropriately dealt with under a title that, *expressively*, purported to deal *only* with Jacksonville. The respondent holding the office of harbor master at the time this act was passed, and the people generally of the locality, likewise took notice from the title of this act, that from the nature of the duties and powers of the office, and the strictly local

territory in which they were to be exercised, and from his close connection with the preservation of the peace and good order of the city's water front, that he *could* be (not *would* be) appropriately incorporatod under the act into the city's corps of police officials.

My view is that the act should be upheld, and that the demurrer interposed below should have been overruled; especially do I so think, when I call to mind the universally accepted canon for the adjudication of constitutional questions, that it should be a clear case, free from every reasonable doubt, before the courts are justified in annulling legislative acts.